# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1380

_____

Zimmer Radio of Mid-Missouri, Inc.

*Petitioner*

ABC Television Affiliates Association; CBS Television Network Affiliates Association; FBC Television Affiliates Association; NBC Television Affiliates; Connoisseur Media, LLC; Eagle Communications, Inc.; Legend Communications of Wyoming, LLC; Mid-West Management, Inc.; Midwest Communications, Inc.; Sun Valley Radio, Inc.

*Intervenors*

v.

Federal Communications Commission; United States of America

*Respondents*

NCTA-The Internet & Television Association; American Television Alliance

*Intervenors*

-------------------------------

Common Cause; Free Press; Future of Music Coalition; National Association of Broadcast Employees and Technicians-Communications Workers of America; United Church of Christ, Office of Communication, Inc.; musicFIRST Coalition

*Amici on Behalf of Respondent*

_____

No. 24-1480
_____

Beasley Media Group, LLC; Tri-State Communications, Inc.

*Petitioner*s

ABC Television Affiliates Association; CBS Television Network Affiliates Association; FBC Television Affiliates Association; NBC Television Affiliates; Connoisseur Media, LLC; Eagle Communications, Inc.; Legend Communications of Wyoming, LLC; Mid-West Management, Inc.; Midwest Communications, Inc.; Sun Valley Radio, Inc.

*Intervenor*s

v.

Federal Communications Commission; United States of America

*Respondent*s

NCTA-The Internet & Television Association; American Television Alliance

*Intervenor*s

-----------------------------

Common Cause; Free Press; Future of Music Coalition; National Association of Broadcast Employees and Technicians-Communications Workers of America; United Church of Christ, Office of Communication, Inc.; musicFIRST Coalition

*Amici on Behalf of Respondent*
_____

No. 24-1493
_____

National Association of Broadcasters

*Petitioner*

ABC Television Affiliates Association; CBS Television Network Affiliates Association; FBC Television Affiliates Association; NBC Television Affiliates; Connoisseur Media, LLC; Eagle Communications, Inc.; Legend Communications of Wyoming, LLC; Mid-West Management, Inc.; Midwest Communications, Inc.; Sun Valley Radio, Inc.

*Intervenor*s

v.

Federal Communications Commission; United States of America

*Respondent*s

NCTA-The Internet & Television Association; American Television Alliance

*Intervenor*s

------------------------------

Common Cause; Free Press; Future of Music Coalition; National Association of Broadcast Employees and Technicians-Communications Workers of America; United Church of Christ, Office of Communication, Inc.; musicFIRST Coalition

*Amici on Behalf of Respondent*
_____

No. 24-1516
_____

Nexstar Media Group, Inc.

*Petitioner*

ABC Television Affiliates Association; CBS Television Network Affiliates Association; FBC Television Affiliates Association; NBC Television Affiliates;

Connoisseur Media, LLC; Eagle Communications, Inc.; Legend Communications of Wyoming, LLC; Mid-West Management, Inc.; Midwest Communications, Inc.; Sun Valley Radio, Inc.

*Intervenor*s

v.

Federal Communications Commission; United States of America

*Respondent*s

NCTA-The Internet & Television Association; American Television Alliance

*Intervenor*s

------------------------------

Common Cause; Free Press; Future of Music Coalition; National Association of Broadcast Employees and Technicians-Communications Workers of America; United Church of Christ, Office of Communication, Inc.; musicFIRST Coalition

*Amici on Behalf of Respondent*
_____

Petition for Review of an Order of the
Federal Communications Commission
_____

Submitted: March 19, 2025
Filed: July 23, 2025
_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Every four years, the Federal Communications Commission (FCC) is statutorily obligated to review its media ownership regulations to determine whether they are still "necessary in the public interest as the result of competition." Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12. Following its 2018 Quadrennial Review, the Commission issued its Order in December 2023 retaining all rules and tightening one of them. See generally In re 2018 Quadrennial Regulatory Review—Report and Order (2023 Order), 38 FCC Rcd. 12782 (2023). Petitioners and Intervenors, representing thousands of television and radio broadcasters, challenged the 2023 Order on the grounds that the Commission erred by defining the relevant video and audio markets too narrowly, retaining all parts of the radio and television ownership rules, and tightening Note 11 of the television ownership rule. We agree with Petitioners that the Commission arbitrarily and capriciously retained the Top-Four Prohibition part of the television ownership rule and improperly tightened Note 11. We disagree with the remainder of Petitioners' claims. Thus, having jurisdiction under 28 U.S.C. §§ 2341(1) and 2344 and 47 U.S.C. § 402(a), we grant the petition in part, remanding and vacating the Top-Four Prohibition and the amendment to Note 11 but withholding for 90 days issuance of the mandate as to the Top-Four Prohibition, and we deny the remainder of the petition.

I.

For nearly a century, the Federal Communications Commission has possessed broad statutory authority to regulate broadcast media, including television and radio stations. See FCC v. Prometheus Radio Project, 592 U.S. 414, 416, 418 (2021); see also 47 U.S.C. §§ 303, 309(a). Exercising that authority, the FCC has strictly regulated the number of television and radio stations that any individual may own. See 47 C.F.R. § 73.3555.

But the broadcast industry has undergone significant development over the past century. "By the 1990s, . . . the market for news and entertainment had changed dramatically." Prometheus, 592 U.S. at 418. In light of "technological advances"

in the industry, see id. at 418-19, Congress passed the Telecommunications Act of 1996 "to promote competition and reduce regulation," see 110 Stat. at 56. In addition to repealing or relaxing certain statutory ownership restrictions, the 1996 Act also instructed the FCC to "review . . . its ownership rules" every four years[1] and "determine whether any of such rules are necessary in the public interest as the result of competition." See id. § 202(h); see also § 202(a), (b), (c)(1)(A)-(B), (d), (f)(1). It further instructs the FCC to "repeal or modify any regulation . . . no longer in the public interest." Id. § 202(h). Thus, Section 202(h) "establishes an iterative process" that "ensure[s] that the FCC's ownership rules do not remain in place simply through inertia." Prometheus, 592 U.S. at 419. The FCC conducts this review by considering whether the existing rules promote competition, localism, and diversity of viewpoint. See In re 2002 Biennial Regulatory Review—Report and Order and Notice of Proposed Rulemaking (*2003 Order*), 18 FCC Rcd. 13620, 13713 (2003).

In the decades since, the results of these quadrennial reviews have frequently faced challenges. Sometimes, the FCC's efforts to loosen restrictions have been held unlawful by courts. See Prometheus, 592 U.S. at 420. Other times, the Commission's decision not to modify rules has successfully been challenged. See, e.g., Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1053 (D.C. Cir.), modified on reh'g, 293 F.3d 537 (D.C. Cir. 2002). And in 2014, the FCC reported that it had been unable to complete its 2010 review "based on deficiencies in the record," but stated it would merge the 2010 review with the 2014 review. Prometheus Radio Project v. FCC (Prometheus III),[2] 824 F.3d 33, 51 (3d Cir. 2016); see also In re 2014

---

[1]The Act initially instructed the FCC to conduct its review biennially, § 202(h), but Congress later extended the review period to every four years. See Consolidated Appropriations Act, Pub. L. 108-199, § 629, 118 Stat. 3, 99-100 (2004).

[2]Prior to reaching the Supreme Court, the Prometheus case involved lengthy litigation in the Third Circuit. See Prometheus Radio Project v. FCC (Prometheus I), 373 F.3d 372 (3d Cir. 2004), as amended (June 3, 2016); Prometheus Radio Project v. FCC (Prometheus II), 652 F.3d 431 (3d Cir. 2011); Prometheus III, 824

-6-

Quadrennial Regulatory Review—Further Notice of Proposed Rulemaking and Report and Order (2014 Order), 29 FCC Rcd. 4371, 4372 (2014). That order was eventually issued a few years later. In re 2014 Quadrennial Regulatory Review—Second Report and Order (2016 Order), 31 FCC Rcd. 9864 (2016). Following a petition for reconsideration and the appointment of a new Commission Chair, the Commission issued a new order, loosening some of the rules that had been retained in the 2016 Order. See In re 2014 Quadrennial Regulatory Review—Order on Reconsideration and Notice of Proposed Rulemaking (2017 Reconsideration Order), 32 FCC Rcd. 9802 (2017); see also Prometheus, 592 U.S. at 420-21.

At issue in this case is the FCC's 2018 quadrennial review. The Commission initiated the review in December 2018, issuing a notice of proposed rulemaking in relevant part on the Local Radio Ownership Rule and the Local Television Ownership Rule. In re 2018 Quadrennial Regulatory Review—Notice of Proposed Rulemaking (2018 Notice), 33 FCC Rcd. 12111, 12111-12 (2018). The Local Radio Ownership Rule prohibits entities from owning more than a certain number of radio stations in a geographic market and further limits the number of AM or FM stations entities may own in the market (the AM/FM "subcaps"). 47 C.F.R. § 73.3555(a). Those numbers, which were set by Congress as part of the 1996 Act, have remained unchanged since. See § 202(b)(1). The Local Television Ownership Rule comprises two parts. Id. § 73.3555(b). The Two-Station Limit prohibits an entity from owning more than two full-power television stations in the same geographic market, and the Top-Four Prohibition precludes any entity from owning more than one of the top four stations in the same geographic market. Id. The Top-Four Prohibition is subject to exception if an applicant shows that such an exception "would serve the public interest, convenience, and necessity." Id. § 73.3555(b)(2). The FCC sought comment on "whether, given the current state of the media marketplace, [it] should retain, modify, or eliminate any of these rules." 2018 Notice, 22 FCC Rcd. at 12111.

---

F.3d at 33; Prometheus Radio Project v. FCC (Prometheus IV), 939 F.3d 567 (3d Cir. 2019), rev'd in part, 592 U.S. 414 (2021), and vacated 846 F. App'x 88 (3d Cir. 2021). We identify each of the Third Circuit cases chronologically as Prometheus I-IV and refer to the Supreme Court's decision as Prometheus.

The FCC received hundreds of comments. After the initial comment period closed in April 2019, the Supreme Court issued its opinion in Prometheus in April 2021. In light of "the passage of time since the prior comment period ended" and "the subsequent litigation," the FCC sought further comment in June 2021 to update the record in the 2018 Quadrennial Review proceeding. In re 2018 Quadrennial Regulatory Review—Public Notice, 36 FCC Rcd. 9363, 9363-64 (2021). Commenters were invited to review and comment on materials that had already been filed as well as on any new or additional information. Id. at 9366. Following an extension, the comment period closed in October 2021.

More than two years later, under threat of potential mandamus and over two dissenting statements, the FCC issued its 2018 quadrennial review order in December 2023. See 2023 Order, 38 FCC Rcd. at 12782. It changed almost nothing.

The Commission began by defining the relevant markets. For the Local Radio Ownership Rule, the FCC defined the market as the "radio listening market," excluding "satellite or non-broadcast audio sources, such as Internet streaming services." Id. at 12799. In other words, non-broadcast sources of audio content such as Sirius XM/Pandora, Spotify, YouTube Music, Apple Music, Amazon Music, and podcasts were not factored into the FCC's analysis on the Local Radio Ownership Rule. See id. at 12800-02. Similarly, for the Local Television Ownership Rule, the FCC limited the market to broadcast television, excluding other sources of video programming such as cable and on-demand streaming services (Netflix, Disney+, YouTube TV, etc.). Id. at 12822-23. The Commission acknowledged "the proliferation of new forms and sources of programming," but justified its limited market definitions by highlighting the unique aspects of broadcast sources, such as access to radio without internet service or paid subscriptions and the existence of retransmission consent fees, network affiliations, and provision of local programming in broadcast television. Id. at 12783, 12800-01, 12824.

With the markets defined, the Commission then retained both the radio and television rules. It preserved the existing market size tiers and numerical limits in

radio after determining they were necessary to "prevent consolidation to the level of monopolization or near monopolization." Id. at 12864. It similarly left in place the Commission's AM/FM subcaps, noting that "lifting them would have deleterious impacts on the AM band, including excessive, undue concentration of ownership." Id. In retaining the Top-Four Prohibition, the FCC emphasized that "its case-by-case approach[] strikes a reasonable balance" between its public interest goals and the need for occasional exceptions. Id. However, it tweaked the metric by which it determines which stations are among the top four in any given market; the "audience share methodology" now factors in measurable multicast[3] programming, which had previously been disregarded. Id. at 12820. The Commission further opted to retain the Two-Station Limit because allowing station owners to acquire a third station "would mean the loss of an independent station operator, to the detriment of competition, localism, and viewpoint diversity." Id. at 12827-28.

Finally, the FCC modified Note 11, an existing provision regarding the Top-Four Prohibition, to prevent circumvention. Id. at 12783. Note 11 bars entities from acquiring the network affiliation of another station if doing so would result in an entity owning two top-four stations. 47 C.F.R. § 73.3555, Note 11. So if, for example, Station Owner A owns two stations in the same geographic area—one of which is a top-four station affiliated with a major news network and the other of which is not—Station Owner A may not acquire the network affiliation of Station Owner B if doing so would result in Station Owner A owning or controlling two of the top four stations in the geographic area. See, e.g., In re Gray Television, Inc., 36 FCC Rcd. 10856, 10856-58 (2021). However, prior to the most recent order, Note 11 excluded from its scope low-power TV[4] stations and multicast streams. See 47

---

[3]Multicast streams means multiple programming streams on a single station. See 2023 Order, 38 FCC Rcd. at 12836.

[4]Low-power TV "offers programming tailored to the interests of viewers in . . . small localized areas, . . . in a less expensive and more flexible way than traditional full-power television stations" and "includes television 'translator' stations that serve to rebroadcast the signals of full-power stations in areas where the full-power station signals cannot be received due to distance or intervening terrain

-9-

C.F.R. § 74.732(b) ("Low power TV and TV translator stations are not counted for purposes of § 73.3555, concerning multiple ownership."); see also 2014 Order, 29 FCC Rcd. at 4388 (noting that "the ability to multicast is not a substitute for common ownership of multiple stations"). Thus, historically, Station Owner A could acquire a second top-four network affiliation if he only aired that affiliation's programming through a secondary type of outlet like low-power TV or a multicast stream. The 2023 Order eliminated that option. In order to "close[] loopholes to Note 11 and the Top-Four Prohibition," the order expanded Note 11 to include low-power TV stations and multicast streams. Id. at 12838-40.

Zimmer Radio and several other organizations, who collectively represent many television and radio broadcasters, filed petitions for review of the 2023 Order in multiple circuits. The petitions were consolidated and randomly assigned to the Eighth Circuit. Petitioners and their subsequent intervenors challenge several aspects of the 2023 Order. They first argue that the FCC erred in excluding non-broadcast sources from the radio and television market definitions. They further argue that even if the FCC adopted the right market definitions, the Commission's decision to retain the Local Radio and Television Ownership Rules was arbitrary and capricious in violation of the Administrative Procedure Act (APA). Finally, they contend that the amendment to Note 11 was impermissible on four different grounds. We address each challenge in turn.

II.

Petitioners begin by challenging the market definitions the FCC used for both the radio and television rules, contending the Commission defined the markets too narrowly. They have two different bases for this argument. First, Petitioners claim the FCC's definitions violate Section 202(h) of the 1996 Act, which instructs the

---

barriers." Low Power Television Service, FCC (Dec. 9, 2019), https://www.fcc.gov/consumers/guides/low-power-television-lptv-service.

Commission to consider the necessity of its rules[5] "in the public interest *as the result of competition*." See § 202(h) (emphasis added). By excluding non-broadcast sources of competition from consideration, Petitioners contend, the FCC failed to follow Section 202(h)'s command. In the alternative, Petitioners assert the narrow definitions were arbitrary and capricious. "On review of an agency order, we must 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Citizens Telecomms. Co. of Minn., LLC v. FCC, 901 F.3d 991, 1000 (8th Cir. 2018) (alteration in original) (quoting 5 U.S.C. § 706(2)). We decline to grant the petition for review on either ground.

A.

We begin with Petitioner's argument that the FCC's narrow definitions violate Section 202(h). This argument turns on the meaning of "competition" in Section 202(h). See § 202(h). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and "need not . . . defer to an agency interpretation of the law." See Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412-13 (2024). Thus, "[i]t is our responsibility as the reviewing court 'to decide whether the law means what the agency says.'" Union Pac. R.R. Co. v. Surface Transp. Bd., 113 F.4th 823, 833 (8th Cir. 2024) (quoting Loper Bright, 603 U.S. at 392).

In defining the market for purposes of quadrennial reviews, the "critical question," as stated by the FCC, is "whether and to what extent such [non-broadcast]

---

[5]The only three rules that remain subject to Section 202(h) review are the Local Television Ownership Rule, the Local Radio Ownership Rule, and the Dual Network Rule. See 2018 Notice, 33 FCC Rcd. at 12111; see also Prometheus, 592 U.S. at 420 & n.1. The Dual Network Rule is not at issue in this petition. Other rules that were originally subject to the quadrennial review have been eliminated pursuant to the review process. See generally Telecommunications Act of 1996 § 202.

programming options can be considered substitutes to broadcast programming." 2023 Order, 38 FCC Rcd. at 12823.  But the parties dispute when a competitor is an adequate "substitute."  The FCC effectively determined that only *complete* substitutes—competitors in every facet of the business—constitute substitutes for purposes of this inquiry.  See, e.g., id. at 12823-24.  Petitioners respond that not only is complete substitution unnecessary under the Act, it runs counter to the Act's purposes.  In fact, Petitioners say, the Commission "was statutorily obligated to factor [non-broadcast] competition into its public interest analysis" because the word "competition" necessarily covers more than just broadcast competition.  At bottom, the parties disagree on whether "competition" encompasses *all* major competitors or only a relevant subset of those competitors.

"When interpreting a statute, we begin with the text."  Lackey v. Stinnie, 145 S. Ct. 659, 666 (2025).  The Telecommunications Act of 1996 does not define "competition," though the word appears in the Act two dozen times.  See 110 Stat. 56.  Thus, our task is to "interpret the word[] consistent with [its] 'ordinary meaning.'"  See Wis. Cent. Ltd. v. United States, 585 U.S. 274, 277 (2018) (citation omitted).  Often, the first step of the ordinary-meaning inquiry is considering dictionary definitions from the time the statute was enacted.  Sanzone v. Mercy Health, 954 F.3d 1031, 1041 (8th Cir. 2020).  According to the Black's Law Dictionary in effect the year the Telecommunications Act was enacted, "competition" is "[t]he effort of two or more parties, acting independently, to secure the business of a third party by the offer of the most favorable terms," or "the act of seeking or endeavoring to gain what another is endeavoring to gain at the same time."  Competition, Black's Law Dictionary (6th ed. 1990).[6]  Thus, considered in

---

[6]Current definitions of the word are similar.  See, e.g., Competition, Black's Law Dictionary (12th ed. 2024) (defining competition as "[t]he struggle for commercial advantage" or "the effort or action of two or more commercial interests to obtain the same business from third parties"); Competition, Merriam-Webster's Collegiate Dictionary (11th ed. 2020) (providing similar definitions, including "the effort of two or more parties acting independently to secure the business of a third party by offering the most favorable terms").

isolation, the word "competition" as ordinarily understood could embrace either party's view.

But we do not limit our analysis to the word "competition"; rather, "[i]nterpretation of a word or phrase depends upon reading the whole statutory text." See Dolan v. U.S. Postal Serv., 546 U.S. 481, 486 (2006). By requiring the FCC to determine whether its rules "are necessary *in the public interest* as the result of competition," Congress suggested that "competition" should be read through the lens of the "public[-]interest" standard, a standard which provides significant discretion to the Commission. As the Supreme Court has long recognized, the public-interest standard is "a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy." See FCC v. WNCN Listeners Guild, 450 U.S. 582, 593 (1981) (citation omitted). Thus, under the broad regulatory authority Congress has given it, the Commission may "implement its view of the public-interest standard of the Act 'so long as that view is based on consideration of permissible factors and is otherwise reasonable.'" Id. at 594 (citation omitted).

The FCC has similar discretion to interpret "competition" so as best to serve the public interest. Congress has crafted many statutes that intentionally provide agencies with discretion. See Loper Bright, 603 U.S. at 394. And sometimes the duty of a court is to interpret a statutory word as providing such discretion. See id. at 395. Particularly in cases involving agencies, "[a] statute's meaning may well be that the agency is authorized to exercise a degree of discretion." Id. at 394. "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." Id. at 395. Here, we do so by "recognizing [the] constitutional delegation[]." Id. The Supreme Court has already recognized that the public-interest standard grants the FCC discretion. See WNCN Listeners Guild, 450 U.S. at 593-94 (discussing the public-interest standard in the context of the Communications Act of 1934). Similarly, in light of the Commission's "broad power to regulate in the public

interest," we recognize the Commission is best positioned to define "competition" for purposes of Section 202(h). See id. at 594; see also Prometheus, 592 U.S. at 418 (describing the FCC's "broad statutory authority to regulate broadcast media"); 47 U.S.C. §§ 303, 309(a) (outlining the Commission's power).

This principle is particularly applicable here, given the persuasive nature of the FCC's interpretation. "[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." Loper Bright, 603 U.S. at 394. Beginning with the Commission's first Section 202(h) review in 1998, the Commission has limited its definition of "competition" to broadcast programming. See In re 1998 Biennial Regulatory Review—Biennial Review Report (2000 Order), 15 FCC Rcd. 11058, 11088-89 (2000) (defining the relevant market for audio narrowly); In re Review of the Commission's Regulations Governing Television Broadcasting—Report and Order (1999 Order), 14 FCC Rcd. 12903, 12935 (1999) (limiting the relevant market for television to broadcast); see also 2000 Order, 15 FCC Rcd. at 11060 (adopting the 1999 Order for purposes of the Local Television Ownership Rule). It has maintained this definition in the nearly 30 years since. See, e.g., 2016 Order, 31 FCC Rcd. at 9875, 9989; In re 2006 Quadrennial Regulatory Review—Report and Order and Order on Reconsideration, 23 FCC Rcd. 2010, 2065, 2069 (2008); 2003 Order, 18 FCC Rcd. at 13676, 13693, 13712-13, (2003). But see 2003 Order, 18 FCC Rcd. at 13668 (considering an aspect of the Local Television Ownership Rule "in light of the myriad sources of competition to local television broadcast stations," including "other video programming outlets"). While consistency of position is not dispositive, an agency's statutory interpretation that is "consisten[t] with earlier and later pronouncements" has "power to persuade." See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944); cf. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (noting that when an agency *changes* position, it must "display awareness" of that change and offer "good reasons for the new policy." The FCC's consistent approach to defining the markets helps make this the type of "interpretation [from the agency] responsible for implementing [the]

-14-

statute[]" that properly provides aid to this Court in defining an uncertain term. See Loper Bright, 603 U.S. at 394.

Moreover, this is not the type of "legal interpretation" that "has been, 'emphatically,' 'the province and duty of the judicial department' for at least 221 years." Id. at 412 (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803)). The meaning of "competition" is not the crux of the dispute. In fact, when presented with a potential Black's Law definition[7] of competition at oral argument, both sides accepted the same proposed definition. Oral Arg. at 13:17-14:08, 52:41-53:05. The Section 202(h) dispute here deals not with the *meaning* of competition, but with the *degree*—how *much* competition must be considered in analyzing the ownership rules subject to Section 202(h) review. Even Petitioners do not argue that all varieties of competition must be accounted for. See also 2003 Order, 18 FCC Rcd. at 13672 (declining to consider reading, listening to music, watching VCRs/DVDs, and going to movie theaters to be substitutes for broadcast television). In essence, the question is one of line drawing. In such a "technical subject matter" presenting a "policy choice[]," that decision was appropriately delegated to "the responsible agency." See Loper Bright, 603 U.S. at 449 (Kagan, J., dissenting); see also id. at 412-13 (majority opinion); Seven Cnty. Infrastructure Coal. v. Eagle County, 145 S. Ct. 1497, 1513 (2025) (noting in a different context that within reason, "courts should defer to agencies' decisions about where to draw the line"); AT&T Corp. v. FCC, 220 F.3d 607, 627 (D.C. Cir. 2000) ("[L]ine-drawing is the agency's responsibility."). To divest the FCC of this Congressionally granted discretion would be to overstep our own authority.

Of course, this does not provide the FCC with unbounded discretion. The Commission's interpretation still must be "not inconsistent with law." See WNCN Listeners Guild, 450 U.S. at 594 (citation omitted). The FCC may define the relevant markets narrowly or broadly—but it may not forego consideration of competition

---

[7]The cited Black's Law definition was stated as follows: "The struggle for commercial advantage or the effort or action of two or more commercial interests to obtain the same business from third parties." Oral Arg. at 13:17-13:40.

altogether. See § 202(h), 110 Stat. 56, 111-12. Moreover, this discretion does not operate outside the constraints of the APA's arbitrary-and-capricious review. See Loper Bright, 603 U.S. at 395. The agency is still required to engage in "reasoned decisionmaking" within the boundaries of its discretion. Id. (citation omitted). We consider a challenge to the agency's decision making under the APA's arbitrary-and-capricious standard next. But because Congress granted the FCC discretion to interpret Section 202(h) within the public interest, we decline to grant the petition on the basis that the FCC's definition of "competition" is inconsistent with Section 202(h).

B.

Petitioners further argue that even if Section 202(h) provides the FCC with discretion to define "competition," the Commission's chosen definition is arbitrary and capricious. While judicial review of an agency's statutory interpretation is generally de novo, "when an agency exercises discretion . . . , judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard." Seven Cnty. Infrastructure Coal., 245 S. Ct. at 1511. That standard

> requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.

Prometheus, 592 U.S. at 423. An agency action may be arbitrary and capricious in many ways: by (1) "rel[ying] on factors which Congress has not intended it to consider," (2) "entirely fail[ing] to consider an important aspect of the problem," (3) "offer[ing] an explanation for its decision that runs counter to the evidence before the agency," or (4) offering an explanation that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Citizens

-16-

Telecomms. Co., 901 F.3d at 1000 (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Petitioners' primary claim is that the FCC ignored key evidence showing that non-broadcast sources compete directly with broadcast sources—an argument that the FCC either "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence." See State Farm, 463 U.S. at 43.

As to television, Petitioners accuse the FCC of ignoring a myriad of sources showing that digital services are supplanting broadcast programming. Petitioners' evidence shows that viewers are increasingly swapping television content for digital media content and actual television screens for computers, phones, tablets, and similar devices. See Department of Justice, Ex Parte Communication on 2018 Quadrennial Regulatory Review, Ex. B (NERA Evolution Study), at 12-13 (Jan. 6, 2021), https://www.fcc.gov/ecfs/document/1010618609030/1; National Association of Broadcasters, Comments on 2018 Quadrennial Regulatory Review (NAB Comments), Attach. B, at 6-10 (Apr. 29, 2019), https://www.fcc.gov/ecfs/document/10429077016730/1; see also In re Communications Marketplace Report (2022 Marketplace Report), 37 FCC Rcd. 15514, 15682 (2022). Viewers are decreasing their time spent watching traditional television (both broadcast and cable) and increasingly choosing to rely exclusively on online video programming. See NAB Comments, Attach. B, at 6-7; 2022 Marketplace Report, 37 FCC Rcd. at 15682. In fact, more than three out of every four households subscribes to at least one of the three top online video programmers (Netflix, Amazon Prime, Hulu). 2022 Marketplace Report, 37 FCC Rcd. at 15682. Similarly, advertisers are replacing television advertising dollars with online video dollars as they increasingly view digital platforms as a substitute for local television advertising. NERA Evolution Study, at 3, 25.

The FCC does not dispute—nor could it—the "growing prevalence" of online video. See 2023 Order, 38 FCC Rcd. at 12823. Rather, it characterizes cable, video,

and other non-broadcast programming as "complement[ing], rather than compet[ing] with, broadcast television." Id. Because "non-broadcast sources of video programming do not compete with broadcasters for retransmission consent fees, network affiliations, or the provision of local programming," the FCC determined, those non-broadcast sources operate within a different market. Id. at 12824. In other words, non-broadcast programming options are not "substitutes to broadcast programming" or "competitive market forces" that are alone "sufficient to create a video marketplace that satisfies the public interest objectives long associated with broadcast television." Id. at 12823.

The arguments are similar as to audio. Petitioners point to evidence that the percentage of people ages twelve and up who listen to online audio each month has increased from 5 percent in 2000 to 75 percent in 2023, while FM station listening dropped nearly 25 percent from 2016 to 2021 by one metric and AM listening "has struggled for decades with a steady decline in listenership." See Connoisseur Media, LLC, Letter on 2018 Quadrennial Regulatory Review (Connoisseur Letter), Attach. B, Ex. A (Nov. 9, 2023), https://www.fcc.gov/ecfs/document/11092138617075/1; National Association of Broadcasters, Reply Comments on 2018 Quadrennial Regulatory Review (NAB Reply Comments), at 67-68 (Oct. 1, 2021), https://www.fcc.gov/ecfs/document/1001276664329/1; In re All-Digital AM Broadcasting Revitalization of the AM Radio Service—Notice of Proposed Rulemaking, 34 FCC Rcd. 11560, 11560 (2019). On the advertising side, Petitioners note that local radio advertisers decreased their annual expenditures by 47 percent from 2017 to 2022, as local advertisers now "see radio and digital advertising as substitutes—shifting dollars back and forth between these media for various reasons." See, e.g., Connoisseur Letter, Attach. A, Ex. F, at 4; Connoisseur Media, LLC, Joint Comments on 2018 Quadrennial Regulatory Review (Connoisseur Joint Comments), Ex. B, at B-4 (Apr. 29, 2019), https://www.fcc.gov/ecfs/document/104292645416049/1. The FCC pushes back on some of Petitioners' evidence, noting that "[d]espite declines in radio's popularity[,] . . . . the total number of broadcast radio *stations* remained fairly steady, and actually increased slightly, between 2015 and 2020." 2023 Order, 38 FCC Rcd. at 12807 (emphasis added).

Further, the Commission determined that while many companies may be moving their advertising dollars, "at least some advertisers do not view [Internet platforms] as substitutes" to radio. Id. at 12800. But more fundamentally, the FCC rejected Petitioners' arguments not because it disagreed with their evidence about the rise of non-broadcast audio media, but because "free over-the-air broadcast radio maintains a unique place" in which "radio stations compete primarily with other radio stations for listeners." Id. Notably, "of the various options available in the broader audio marketplace, generally speaking, only terrestrial broadcast radio both is available without a paid subscription and does not require access to Internet service." Id. at 12800-01.

Under the deferential arbitrary-and-capricious standard, we decline to second-guess the FCC's market definitions. "The scope of this review 'is narrow,' and [we] must exercise appropriate deference to [the FCC's] decisionmaking and not substitute [our] own judgment for that of the [Commission]." See FDA v. Wages & White Lion Invs., LLC 145 S. Ct. 898, 917 (2025). Here, "the Commission has considered the relevant factors and articulated a rational connection between the facts found and the choice made." See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 105 (1983).

The FCC acknowledged the ways in which non-broadcast programming competes with broadcast television and radio, but declined to factor them into the analysis after determining that those competitive forces on their own are insufficient to foster competition, localism, and viewpoint diversity. See 2023 Order, 38 FCC Rcd. at 12800-02, 12804, 12822-24. Though Petitioners claim the FCC ignored several key pieces of evidence, the Commission responded to Petitioners' primary evidence and arguments. For instance, although the FCC only made one passing reference to Petitioners' NERA Evolution Study—which, among other findings, determined that both viewers and advertisers are increasingly substituting online digital platforms for broadcast television—the Commission cited numerous different sources for the proposition that "non-broadcast programming is not a substitute to broadcast programming, which remains unique." See id. at 12823; NERA Evolution

-19-

Study, at 3, 12-13, 25. Or take Petitioners' argument that substantial evidence establishes that radio is losing advertising revenue to online and digital audio platforms, proving the existence of competition. See Connoisseur Joint Comments, Ex. B, at B-2. The FCC acknowledged this evidence, but was ultimately unpersuaded because other evidence—also submitted by radio broadcasters—showed that the type of advertising is different; online advertising is focused on "micro-target[ting] potential customers," which radio advertising cannot do. See 2023 Order, 38 FCC Rcd. at 12800; iHeartCommunications, Inc., Comments on 2018 Quadrennial Regulatory Review, at 11-12 (Apr. 29, 2019), https://www.fcc.gov/ecfs/document/104300252612325/1. In light of these points of "conflicting evidence," the FCC "rationally [chose] which evidence to believe." See Citizens Telecomms. Co., 901 F.3d at 1011. Moreover, Petitioners pointed to no case law requiring the FCC to respond to every single piece of evidence submitted. Cf. Wages & White Lion Invs., 145 S. Ct. at 917 (noting that the arbitrary-and-capricious standard requires agencies to "examine[] the *relevant* data and articulate[] a satisfactory explanation for its action" (emphasis added) (citation omitted)).

Petitioners further argue that even if any unique characteristics of broadcast programming would warrant excluding non-broadcast sources from the market definition, those "unique" aspects are illusory. First, Petitioners claim retransmission consent fees do not justify the narrow market definitions because they are not immune from non-broadcast market forces; the fees broadcasters charge for retransmission are tethered to the amount of viewers—which means that as viewers turn to other content sources, the consent fees are affected. See Four Affiliates Associations, Reply Comments on 2018 Quadrennial Regulatory Review (Affiliates Reply Comments), at 10 (Oct. 1, 2021) https://www.fcc.gov/ecfs/document/ 1001222267832/1 (noting that because retransmission consent fees are "keyed to the number of subscribers in a station's market," when viewers "cut the cord" by moving to other services, "retransmission consent fees are increasingly threatened"). But even if external sources *could* affect retransmission consent fees, the evidence does not show that they are doing so. Rather, the FCC determined that "broadcast

content . . . has special appeal to television viewers in comparison to any other type of video content" and that retransmission fees can effectively be checked by "[p]romoting competition among local television stations." 2023 Order, 38 FCC Rcd. at 12824-25. Similarly, Petitioners contend that network affiliations do not justify the narrow market definitions because even though digital platforms do not compete for network *affiliations*, they air network *content* itself. See Affiliates Reply Comments, at 4-6 (noting that the major broadcast networks produce Paramount+, Disney+, and Peacock). Thus, Petitioners say, non-broadcast programs compete directly with broadcasters to distribute the same programming. But this argument conflates competition *among broadcasters* to win the best network affiliation with competition *among all entertainment* to win viewers and advertiser dollars. The fact that broadcast television is part of the broader entertainment market does not mean it cannot also be part of a "well-defined submarket" within the broader market. See Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).

Finally, Petitioners claim the market definitions were arbitrary and capricious because the FCC "relied on factors which Congress has not intended it to consider." See State Farm, 463 U.S. at 43. Specifically, Petitioners point to the FCC's references to antitrust analysis from the Department of Justice (DOJ). See 2023 Order, 38 FCC Rcd. at 12799-800, 12824. The FCC noted that DOJ "consistently has found broadcast radio advertising to constitute a distinct product market" and "considers local broadcast television to be its own market in antitrust analysis." Id. at 12799, 12824. Petitioners point to no authority establishing that DOJ's views are irrelevant to market definitions in other contexts—and we find no reason to view them as such. If anything, Congress's explicit reference to competition in Section 202(h) favors consideration of related market definitions in DOJ antitrust analysis. DOJ's determination that broadcast radio and broadcast television constitute their own unique markets is just one factor in support of the FCC's position. See id. at 12799, 12824. The fact that DOJ's analysis disregards competition for audience share does not make DOJ's analysis *irrelevant*, it only makes it less helpful. Moreover, the FCC does not purport to place heavy reliance on the DOJ's analyses. Rather, the FCC acknowledges that the DOJ's approach does not provide a perfect

-21-

comparison but notes that it "further supports, and is consistent with, [its] own." See id. at 12824; see also id. at 12799-800 (considering a plethora of other sources for the same conclusion). It was not improper for the FCC to review analysis from government antitrust proceedings in determining the relevant markets.

Zooming out, the FCC's approach to defining the markets is not illogical. While it may feel counterintuitive to disregard the significant marketplace changes in the audio and visual industries, the FCC articulated valid reasons for setting those changes aside for purposes of this review. In the world of television, for instance, the exponential increase in retransmission consent fees could provide broadcasters with excessive market leverage. See NCTA, Ex Parte Communication on 2018 Quadrennial Regulatory Review, at 2 (Dec. 6, 2023), https://www.fcc.gov/ ecfs/document/1206132148022/1 (noting that retransmission consent revenue is up 1,084 percent since 2010 and 85 percent over the last six years). Similarly, the availability of broadcast radio without internet access is critical to the estimated 14.46 million Americans who lack access to fixed broadband service at a standard speed. See 2023 Order, 38 FCC Rcd. at 12801; In re Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion—Fourteenth Broadband Deployment Report, 36 FCC Rcd. 836, at *2, *13 (2021). In considering these types of concerns, the FCC properly considered all three of its public interest goals—competition, localism, and viewpoint diversity.

In sum, Petitioners have not shown that the Commission's decision was not reasoned or reasonable. As discussed above, the Commission did not improperly consider the DOJ antitrust analysis or any other factors Congress did not intend it to consider. Nor did the Commission "entirely fail[] to consider an important aspect of the problem" by setting aside non-broadcast competition because the Commission *considered* the issue and merely came to a conclusion Petitioners disagree with. See State Farm, 463 U.S. at 43. The explanation did not "run[] counter to the evidence" because the FCC was faced with conflicting evidence about the substitutability of non-broadcast sources. See id. And even Petitioners do not argue the decision was

-22-

not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." See id. Writing from a blank slate, we might have viewed the marketplace differently. But "[i]t is not our task to determine what decision we, as Commissioners, would have reached." Balt. Gas & Elec. Co., 462 U.S. at 105. Rather, our task "is to determine whether the Commission has considered the relevant factors and articulated a rational connection between the facts found and the choice made." Id. Here, the FCC considered the growing prevalence of non-broadcast programming and articulated a rational reason for declining to broaden its market definition. Thus, we must accept the market definitions the FCC adopted.

III.

Petitioners next challenge the Local Radio Ownership Rule, which both limits the overall number of stations an entity may own in any given market and the number which may be AM or FM stations. See 47 C.F.R. 73.3555(a)(1). They contest the FCC's decision to retain both the overall numerical limits and market tiers as well as the FM and AM subcaps. Overall, Petitioners claim the FCC failed to affirmatively justify the regulations, discounted evidence showing the demise of radio, and disregarded evidence showing the benefits consolidation could provide to broadcasters. We review Petitioners' challenge under the arbitrary-and-capricious standard outlined above.

First, we do not agree that the FCC failed to sufficiently justify its decision to retain the overall numerical limits and market tiers. The FCC provided several overarching justifications for retaining the rule, noting, for instance, that "loosening the rule would harm competition to the detriment of listeners." 2023 Order, 38 FCC Rcd. at 12799. It also provided general justifications for retaining the "current tiers and limits," explaining that the demarcations "Congress established . . . more than two and a half decades ago" are still "the most effective method for preventing the acquisition of market power in local radio markets." Id. at 12805 (citation omitted). Petitioners correctly point out that these are broad justifications for specific limits

-23-

and that the FCC did not, for instance, "explain why eight stations is the appropriate limitation for broadcasters in the Chicago market (with over 130 radio stations) and for broadcasters in the Kansas City market (with only 45 stations)." While we recognize that Section 202(h) places the burden on the FCC to justify its rules, it does not require the FCC to outline its reason for rejecting every possible alternative approach to numerical limits in a geographic area. See § 202(h), 110 Stat. 111-12. As the Third Circuit explained when rejecting a similar challenge to the local television rule, Petitioners "simply take[] issue with the way in which the Commission chose to draw the lines." Prometheus IV, 939 F.3d at 581. "The choice of [where to draw the line] must be somewhat arbitrary: each market's contours will be slightly different, and no single bright-line rule can capture all this complexity." Id. at 582. Drawing the lines here between different market sizes and different total caps "is exactly the kind of line-drawing, where any line drawn may not be perfect, to which courts are the most deferential." Id. Moreover, the FCC explained why the alternatives proposed by some commenters were not superior to the current rules. See 2023 Order, 38 FCC Rcd. at 12804-05. Section 202(h) requires the FCC to justify retaining the rules, but it does not require the FCC to provide *new* justifications each Quadrennial Review for the specific numbers chosen in the numerical limits. See Prometheus IV, 939 F.3d at 582 ("Section 202(h) requires only that the Commission think about whether its rules remain necessary every four years. It does not imply that the policy justifications for each regulation have a shelf-life of only four years, after which they expire and must be replaced."); see also 2023 Order, 38 FCC Rcd. at 12805 (noting that "changes in the broader audio environment" do not "require a restructuring of the rule's market size tiers or numerical limits"). Similarly, contrary to Petitioners' assertion, the FCC did not ignore radio broadcasters in smaller markets, but simply determined that allowing further consolidation among broadcasters is not the solution. See, e.g., 2023 Order, 38 FCC Rcd. at 12810.

Petitioners' arguments against the FM and AM subcaps also fail. In its order, the FCC justified the subcaps as necessary to "prevent excessive common ownership of either AM or FM stations in a local market." Id. at 12813. The FCC predicted

that relaxing the FM subcaps "could cause AM stations to migrate to the FM band, resulting in a diminished AM band," while loosening the AM subcaps "could lead to excessive concentration within the AM band," which is already seeing a declining number of stations. Id. at 12813-14. These are the type of "predictive" agency judgments to which judicial deference is "especially important." See Sw. Bell Tel. Co. v. FCC, 153 F.3d 523, 547 (8th Cir. 1998) (citation omitted). Similarly, the FCC's failure to explain why it chose exactly the numbers it did—e.g., why the subcap is five in the largest radio markets and three in smaller markets—does not make the Order arbitrary and capricious. The FCC is permitted to use the status quo as a starting point from which to evaluate the rules. Nor was the FCC's handling of evidence indicating a decline in AM listenership arbitrary and capricious. The FCC acknowledged the decline and, based on other evidence, simply disagreed with Petitioners' view that this decline necessitates loosening the subcaps. See 2023 Order, 38 FCC Rcd. at 12813-14. The FCC pointed to sufficient evidence of AM's stability to defend its position that, despite AM's decline, loosening the restrictions could make AM stations acquisition targets. Id. at 12814.[8]

Finally, Petitioners argue that the FCC ignored substantial evidence that station combinations would enable helpful economies of scale. Petitioners fault the FCC for failing to cite a study showing that consolidation would allow radio stations to spread costs and increase cash flow—as demonstrated by evidence that entities who own more stations can more effectively convert listenership into revenue. See NAB Comments, Attach. A, at 27-31, 37-39. The FCC acknowledged the potential benefits of consolidation, but ultimately determined those benefits were outweighed by "the cost of the real and likely harms that would result to the listening public from a further reduction in competition," such as a decrease in local programming. 2023 Order, 38 FCC Rcd. at 12811. Petitioners further claim that such acknowledgement

---

[8]Petitioners also fault the FCC for "ignor[ing] the possibility of eliminating the subcaps in particular markets." While failure to discuss alternatives proposed by a commentator may be arbitrary and capricious, see Menorah Med. Ctr. v. Heckler, 768 F.2d 292, 296-97 (8th Cir. 1985), Petitioners point to no part of the record in which they proposed such an alternative.

was not enough; in Petitioners' view, the study cited by NAB and similar comments far surpassed the credibility of sources the FCC chose to rely on. But these are the types of judgments courts have repeatedly left to agencies. "The disputed question here involves both technical understanding and policy judgment" which are better left to the FCC. See FERC v. Elec. Power Supply Ass'n, 577 U.S. 260, 295 (2016). So long as the FCC addressed the issue "seriously and carefully," this Court's "important but limited role is to ensure that the Commission engaged in reasoned decisionmaking—that it weighed competing views . . . and intelligibly explained the reasons for making [its] choice." Id. Here, after reviewing conflicting evidence, the FCC considered and rejected the argument that economies of scale justify loosening the Local Radio Ownership Rule. Such a determination was not arbitrary and capricious.

IV.

Petitioners also challenge the Local Television Ownership Rule. Four aspects of the rule are at issue: (1) the Two-Station Limit, which precludes entities from owning more than two stations in any given market, (2) the Top-Four Prohibition, which prohibits station owners from owning more than one of the top four stations in the market, (3) the new audience share methodology used to determine ratings for purposes of the Top-Four Prohibition, and (4) the amendment to Note 11, which extends Note 11 and the Top-Four Prohibition to multicast and low-power television streams. The first three issues are subject to arbitrary-and-capricious review, while the Note 11 amendment is challenged on several grounds subject to different levels of review, as discussed below.

A.

Petitioners claim the FCC did not adequately justify its retention of the Two-Station Limit rule. However, we conclude that although the FCC's analysis of the prohibition was brief, it was sufficient to withstand arbitrary-and-capricious analysis. See 2023 Order, 38 FCC Rcd. at 12827-28. It explained that while

loosening the rule may allow for some more operational efficiencies, "such consolidation also would mean the loss of an independent station operator, to the detriment of competition, localism, and viewpoint diversity." Id. at 12828. It further noted that most television markets are already highly concentrated, further advising against loosening the rule. Petitioners once again criticize the Commission for failing to articulate why two is the correct number. The FCC's superficial analysis, Petitioners claim, was not rigorous enough to constitute line-drawing worthy of deference. But the FCC noted that no commenters had urged it to tighten the limitation to one station, and it explained why loosening or eliminating the restriction was counter to its goals. See id. at 12827-28. By adequately discussing its decision not to adjust the limit in either direction, the FCC effectively explained why two stations is the proper limitation.

Petitioners further argue that even if the Two-Station Limit is justified in some markets, the FCC ignored the possibility that it could be loosened in other geographic markets. This is false. The FCC referenced this proposal and rejected it, determining that operators in smaller markets are sufficiently protected by the provision allowing for exceptions to the Top-Four Prohibition. Id. at 12831. Moreover, even if "there might be other more tailored, and more complex, ways" to address the concerns targeted by the Two-Station Limit, "the simplest is to declare, as the Commission has done," that no station may own more than two stations in a market. See Prometheus IV, 939 F.3d at 582. Thus, the FCC's retention of the Two Station Limit was not arbitrary and capricious.

B.

Next, Petitioners challenge the FCC's decision to retain the Top-Four Prohibition. Unlike the ownership limits in radio, which were initially established by Congress via the 1996 Telecommunications Act, the television ownership limitations and the number four were adopted by the FCC. The Top-Four Prohibition was enacted in 1999 as part of a deregulatory effort; the FCC agreed to allow common ownership of two stations in a market only if the stations were not

both within the top four stations in the market, among other conditions. See In re Review of the Commission's Regulations Governing Television Broadcasting—Report and Order, 14 FCC Rcd. 12903, 12907, 12931 (1999). At the time, the regulation was targeted primarily at preventing "the largest stations in the market" from "combin[ing] and creat[ing] potential competition concerns." Id. at 12933. The number four reflected evidence showing that "the top four-ranked stations in each market generally have a local newscast, whereas lower-ranked stations often do not have significant local news programming." Id. Over the years, the FCC shifted its focus, justifying the rule on the "'cushion' of audience share points that separates the top-four stations in a market from the fifth-ranked station." See 2016 Order, 31 FCC Rcd. at 9880. In response to concerns that the cushion did not exist in certain markets and that the prohibition was therefore not appropriate in those markets, the Commission incorporated a "case-by-case review process" in 2017 by which entities may request an exemption from the prohibition. 2017 Reconsideration Order, 32 FCC Rcd. at 9832.

In its 2023 Order, the FCC modified its justification again, retaining the rule primarily on the grounds that "there are still four major broadcast networks" that tend to produce the most highly rated content and affiliate with the top four stations in any market, that the top four stations are "still the most likely . . . to originate local news," and that top-four combinations would lead to a single entity obtaining an unfairly large market share. 2023 Order, 38 FCC Rcd. at 12828-29. The Commission acknowledged data showing that there is no longer a ratings "cushion" between the fourth- and fifth-ranked stations, but did not find the ratings change sufficient to merit modifying the rule. Id. at 12829. It also noted that the availability of exceptions on a case-by-case basis allows flexibility as needed. Id. at 12829-30. Following a "searching" inquiry, see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), we agree with Petitioners that none of these reasons withstand scrutiny. Because the FCC's justifications for the Top-Four Prohibition "run[] counter to the evidence before the agency," we find the Commission's decision to retain the rule arbitrary and capricious. See State Farm, 463 U.S. at 43.

First, the FCC's assertion that top-four combinations would "often result in a single entity obtaining a significantly larger market share than other entities in the market" is unpersuasive. See 2023 Order, 38 FCC Rcd. at 12828. The FCC claims that such combinations "would reduce incentives to compete vigorously against one another." Id. at 12828-29. To begin, the assertion is factually questionable. While a combination between the top-ranked station and any other highly ranked station would likely result in a single entity obtaining a significantly larger market share than the others, the record shows that a combination between the third- and fourth-ranked stations, or even the second- and third-ranked stations, would not necessarily have the same effect. See, e.g., NAB Comments, Attach. B, at 21 (listing more than 50 markets in which the market share of the top-ranked station is greater than the combined market shares of the third- and fourth-ranked stations). In some markets, the top station's audience is at least twice as large as the next station's audience. NAB Comments, Attach. B, at 20 n.21. In markets like those, combinations could facilitate competition, not hinder it. The FCC's only source in support of its assertion is its 2016 Order, in which it discussed the potential "harm to competition where a single firm obtains a significantly larger market share through a combination of two top-four stations." See 2016 Order, 31 FCC Rcd. at 9881; 2023 Order, 38 FCC Rcd. at 12828-29. While the FCC may "rationally choose which evidence to believe among conflicting evidence in its proceedings," see Citizens Telecomms. Co., 901 F.3d at 1011, the Commission here failed to point to evidence *in this proceeding* that conflicts with the NAB evidence, and failed to articulate any reason for crediting evidence cited in an eight-year-old report over a more recent study prepared for this review. Moreover, though the Commission is not required to produce new justifications for its rules every four years, see Prometheus IV, 939 F.3d at 582, its justifications are only as strong as the evidence supporting them.

Next, the FCC's reference to the big four broadcast networks also fails because it lacks evidentiary support. The Commission states conclusively that the four major broadcast networks are "generally" affiliated with the top-four stations in any market, but neither of its cited sources establish this connection. See 2023

Order, 38 FCC Rcd. at 12829; see also id. at 12844-55 (pointing to no specific evidence establishing a connection between the top four stations in any markets and the big four broadcast networks); 2016 Order, 31 FCC Rcd. at 9952 (discussing the big four networks but making no mention of their most likely affiliates). Petitioners, on the other hand, point to evidence showing that at least in some markets, the top four stations are not all affiliated with the four major broadcast networks. See National Association of Broadcasters, Ex Parte Communication on 2018 Quadrennial Regulatory Review, at 4 (Dec. 13, 2023), https://www.fcc.gov/ecfs/document/1213208134787/1; see also 2023 Order, 38 FCC Rcd. at 12829.

The FCC's assertion that the top four stations are most likely to originate local news is also unsupported by the evidence. The FCC cites three sources for that proposition.[9] 2023 Order, 38 FCC Rcd. at 12829. The first, the FCC's 2022 Marketplace Report, only stated the number of television stations that aired and produced local news—not how many of those are top-four stations. See 37 FCC Rcd. at 15678. The second, a report submitted during the comment period, emphasized the importance of broadcast's local news programming, but also failed to tie its numbers to the top four stations. See Leadership Conference on Civil and Human Rights, Reply Comments on 2018 Quadrennial Regulatory Review, at 3-4 (Sept. 30, 2021), https://www.fcc.gov/ecfs/search/search-filings/filing/10930199828833. Finally, the FCC references one of its reports from 2003, which cites a study establishing that top-four stations originate significantly more local news than non-top-four stations. See 2003 Order, 18 FCC Rcd. at 13696-97. But a 22-year-old report citing an even older study alone is insufficient to justify the FCC's

---

[9]Two of these cites appear to be misidentified by the FCC. The FCC's reference to the 2022 Marketplace Report cites 36 FCC Rcd. at 165, a notice of proposed rulemaking in an unrelated proceeding, rather than 37 FCC Rcd. 15514, the 2022 Marketplace Report. The FCC's reference to its 2003 order cites paragraph 194, which discusses the efficiencies of multiple ownership, rather than paragraph 198, which elaborates on origination of local news. We analyze the sources that it appears the FCC intended to cite.

decision, particularly where Section 202(h) was intended in part to "ensure that the FCC's ownership rules do not remain in place simply through inertia." See Prometheus, 592 U.S. at 419.

Finally, the FCC's reference to a "cushion" between the fourth- and fifth-ranked stations is misplaced. Petitioners point to ample evidence that the largest audience gaps are now *among* the top four stations, not *between* the fourth- and fifth-ranked stations. See, e.g., National Association of Broadcasters, Comments on 2018 Quadrennial Regulatory Review (NAB Update Comments), at 85-86 (Sep. 2, 2021), https://www.fcc.gov/ecfs/document/ 109021632005813/1; Gray Television, Inc., Comments on 2018 Quadrennial Regulatory Review, at 8 (Apr. 29, 2019), https://www.fcc.gov/ ecfs/document/10430725728587/1. The FCC acknowledged this. 2023 Order, 38 FCC Rcd. at 12829. The Commission suggests, however, that even if the cushion does not exist, consumers can still suffer from combinations between the larger stations in a market. Id. While that may be true, it does not help the Commission justify the specific number four in the Top-Four Prohibition.

In a last-ditch effort, the FCC relies on its waiver process. "Rather than eliminating the Top-Four Prohibition," the Commission determined that "the flexibility of the case-by-case approach . . . is better suited to address broadcasters' concerns" about certain markets. Id.; see also 47 C.F.R. § 73.3555(b)(2). Even assuming the Commission provides for meaningful relief through the waiver process,[10] the Commission's "case-by-case" approach to enforcement cannot save a rule that is otherwise unjustified and unsupported by the record because "[t]he very

---

[10]Compare In re Consent to Assign Certain Licenses from Imagicomm Greenwood, LLC to Greenwood License LLC, DA 25-473 (Med. Bur. June 4, 2025) (granting waiver authorizing a top-four combination to remain in place), and In re Consent to Assign Certain Licenses from Imagicomm Eureka, LLC to Marquee Broadcasting West, Inc., DA 25-335 (Med. Bur. Apr. 11, 2025) (same), with NAB Comments, at 70 n.269 (noting that "[p]rospective combinations . . . have faced uncertainty in the case-by-case waiver process.").

essence of waiver is the assumed validity of the general rule." See ALLTEL Corp. v. FCC, 838 F.2d 551, 561 (D.C. Cir. 1988) (citation omitted). "The FCC cannot save an irrational rule by tacking on a waiver procedure." Id.

When presented "with an explanation for agency action that is incongruent with what the record reveals," we are "not required to exhibit a naiveté from which ordinary citizens are free" in our review. Dep't of Com. v. New York, 588 U.S. 752, 785 (2019). Here, in light of the evidence against the Top-Four Prohibition and in the absence of any record-supported reason for keeping the rule, we find that the FCC acted arbitrarily and capriciously in retaining the rule. See State Farm, 463 U.S. at 43 (noting that an agency action may be arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency"); see also United Van Lines, Inc. v. United States, 545 F.2d 613, 619 (8th Cir. 1976) (noting this Court "may not supply a reasoned basis for the agency's action that the agency itself has not given" (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947))).

We next must consider the proper remedy. Because the APA instructs a reviewing court to "set aside agency actions, findings, and conclusions found to be" unlawful, see 5 U.S.C. § 706(2), "vacatur is the normal remedy" for an unlawful agency action, Bridgeport Hosp. v. Bercerra, 108 F.4th 882, 890 (D.C. Cir. 2024) (citation omitted). In "exceptional" circumstances in which the agency's error is "curable," however, some courts remand without vacating the agency's action.[11] See id. (citations omitted). When considering whether to vacate or to remand, courts have considered "the seriousness of the order's deficiencies (and thus the extent of

---

[11]In petitions for review of Quadrennial Review orders, we consider not whether to vacate the agency's action (retaining the rule) but rather whether to vacate—"technically, to order the Commission to vacate—the ownership rules" themselves. See Fox Television Stations, 280 F.3d at 1048. Our authority to order such a vacatur stems from the structure of Section 202(h): "If the reviewing court lacked the power to require the Commission to vacate a rule it had improperly retained and could require the Commission only to reconsider its decision, then the [deregulatory] presumption in [Section] 202(h) would lose much of its bite." See id.

doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." See Custom Commc'ns, Inc. v. FTC, No. 24-3137, 2025 WL 1873489, at *9 (8th Cir. July 8, 2025) (per curiam); Ins. Mktg. Coal. Ltd. v. FCC, 127 F.4th 303, 317 (11th Cir. 2025) (citation omitted) (applying the same test); Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (establishing the remand-without-vacatur test).

We need not consider whether to apply this test here because the FCC "is in a better position than th[is Court] to assess the disruptive effect of vacating" the Top-Four Prohibition, see Chamber of Com. v. SEC, 443 F.3d 890, 909 (D.C. Cir. 2006), and because the deficiency may be curable.[12] Thus, this Court vacates and remands the Top-Four Prohibition but withholds the issuance of its Rule 41(b) mandate for 90 days. See id. (describing this approach as "not unprecedented"). This remedy will allow the FCC an opportunity to provide good reason to "modify, accelerate, or postpone the mandate." See id. Such reason may exist if the FCC is able to identify—in the existing record, see SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) (noting that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based")—adequate evidence to support any of its articulated justifications for retaining the rule. If the FCC fails to do so, upon further order the mandate will issue.

## C.

Next, the Television Affiliate Intervenors argue that the FCC's new audience share methodology, which is used to determine the top four stations in any given

---

[12]We note that the 2022 Quadrennial Review is underway and the FCC is reviewing the same three rules at issue in this petition. See Media Bureau Opens Docket & Seeks Comment for 2022 Quadrennial Review of Media Ownership Rules—Public Notice, 37 FCC Rcd. 15097, 15097 (2022).

market, is arbitrary and capricious.[13]  Under the new audience share methodology, the FCC incorporates into its rankings the measurable ratings of a station's multicast streams. 2023 Order, 38 FCC Rcd. at 12828.  The Intervenors claim the new methodology is arbitrary and capricious because it inconsistently treats multicast streams as part of the same station for purposes of rankings, but as a separate station for purposes of the anti-circumvention amendment to Note 11, and because the new methodology will artificially inflate the ratings of stations that operate popular multicast streams by only accounting for multicast streams with *measurable* ratings (i.e., the popular ones).

As a preliminary matter, the parties dispute whether this argument is properly before the Court. The Commission claims the argument is procedurally barred both because Intervenors did not raise the issue before the Commission and because only Intervenors—not Petitioners—briefed the argument in this Court.  While we cannot review questions that the Commission "has been afforded no opportunity to pass" upon unless a petition for reconsideration has been filed, see 47 U.S.C. § 405(a), Intervenors' argument here was properly included in the record before the Commission, see NAB Update Comments, at 100 ("Treating multicast streams, satellites and LPTVs as stations subject to [the local television] rule would be arbitrary and capricious because they are not and never have been equivalent to the full-service TV stations regulated under the ownership rules.").  Though Intervenors' argument during the review was brief and did not address methodology specifically, it was sufficient, particularly because the FCC did not call for comments on television ranking methodology in its notice of rulemaking.  See generally 2018 Notice, 33 FCC Rcd. 12111.  Moreover, though Petitioners did not raise the issue in the main brief, "an intervenor of right" may, in some circumstances, "pursue[] relief that is broader than or different from the party invoking a court's jurisdiction."  Cf. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania, 591 U.S. 657,

---

[13]The new audience share methodology is related to the Top-Four Prohibition. Though we have remanded the Top-Four Prohibition, we address arguments as to the audience share methodology separately because the Commission may be able to justify and thus retain the Top-Four Prohibition on remand.

674 n.6 (2020); see also 28 U.S.C. § 2348 (noting that "any party in interest . . . whose interests will be affected" in agency proceedings "may appear as parties thereto of their own motion and *as of right*" (emphasis added)).

It ultimately makes no difference whether Petitioners can clear these procedural hurdles, however, because their argument fails on the merits. Intervenors' first argument misframes the issue; the FCC's change to the audience-share methodology and its adoption of the new anti-circumvention rule both treat multicast streams as *relevant* to the Top-Four Prohibition and are thus not inconsistent. See 2023 Order, 38 FCC Rcd. at 12832-33, 12835-36. And as to Intervenors' second argument, the Order provided a reasonable justification for modifying its methodology: "the proliferation of [multicast] programming and the industry trend toward carriage of major network affiliate programming on such streams." See id. at 12834-35. While the modification may have a greater impact on broadcasters who operate popular multicast streams with measurable ratings than those whose multicast streams do not have measurable ratings, "not accounting for [multicast stream measurable] ratings when evaluating a station's performance would seem to ignore a potentially significant portion of the station's service and competitive strength within the market." Id. at 12834. This decision "is exactly the kind of line-drawing, where any line drawn may not be perfect, to which courts are the most deferential." Prometheus IV, 939 F.3d at 582. Because the FCC has "reasonably considered the relevant issues and reasonably explained [its] decision," see Firearms Regul. Accountability Coal., Inc. v. Garland, 112 F.4th 507, 519 (8th Cir. 2024) (citation omitted), we need not separately grant the petition on this argument. However, given our remand and vacatur of the Top-Four Prohibition, we also remand and vacate the audience share methodology.

D.

Finally, Petitioners argue the amendment to Note 11[14]—which the FCC labeled an "Anti-Circumvention Measure[]"—was in excess of the FCC's statutory authority under Section 202(h), was arbitrary and capricious, contravened the Communications Act, and violated the First Amendment. The FCC disagrees on all fronts.

Note 11, adopted in 2016 as one of several notes interpreting the local ownership rules, clarifies that the Top-Four Prohibition applies not only to license applications, but also to transactions in which one licensee "acquires the network affiliation of another station." 47 C.F.R. § 73.3555, Note 11. Based on the FCC's belief that "some station owners appear to be circumventing the prohibition on network affiliation acquisitions" by placing acquired network-affiliated programming either on a multicast stream or a low-power TV station, the FCC tightened the language of Note 11 in this review to eliminate such a circumvention. 2023 Order, 38 FCC Rcd. at 12836. This marked a departure from the FCC's former position that low-power TV and multicast streaming were not relevant to the Local Television Ownership Rules. See 2014 Order, 29 FCC Rcd. at 4388; 47 C.F.R. § 74.732(b). Our task is to determine whether the FCC was permitted to adopt such an amendment. In evaluating the Section 202(h) challenge, we "must exercise [our] independent judgment in deciding whether [the FCC] has acted within its statutory authority." See Loper Bright, 603 U.S. at 412.

"Our analysis begins, as always, with the statutory text." Artola v. Garland, 996 F.3d 840, 843 (8th Cir. 2021) (citation omitted). As discussed above, Section 202(h) dictates that the FCC "shall determine whether [its broadcast rules] are necessary in the public interest as the result of competition" and "shall repeal or

---

[14]As with the new audience share methodology, the Note 11 Amendment is also related to the Top-Four Prohibition. We likewise address arguments as to the Amendment because the Commission may be able to justify and thus retain the Top-Four Prohibition on remand.

modify any regulation it determines to be no longer in the public interest." § 202(h), 110 Stat. at 111-12. Thus, the statute provides for a two-step process. First, the Commission determines whether any of the regulations subject to review are necessary in the public interest as the result of competition. If the rules are no longer necessary, the Commission has two choices: repeal or modify. If the rules remain necessary in the public interest, however, the inquiry and the FCC's authority end. To read the language any other way would be to authorize the Commission to tighten a rule that is no longer necessary—an irrational reading. See Landstar Express Am., Inc. v. Fed. Mar. Comm'n, 569 F.3d 493, 498 (D.C. Cir. 2009) (Kavanaugh, J.) ("A statutory outcome is absurd if it defies rationality.").

Here, the Commission evidently believed Note 11 is still within the public interest. That much is clear from the Commission's decision to "extend" the Note's scope after determining it was "necessary." 2023 Order, 38 FCC Rcd. at 12836. Once the FCC made that determination, its authority expired. It could not repeal or modify the rule at all. The FCC attempts to overcome this by asserting that the word "modify" authorizes it to tighten or loosen any rules subject to Section 202(h) review so long as it does so "in the public interest." But this focus on the meaning of "modify" is a red herring because the FCC only has authority to modify a regulation that it has "determine[d] to be no longer in the public interest." See § 202(h), 110 Stat. at 112. No such determination was made here, and thus the FCC's arguments about the meaning of "modify" are unavailing.

Even if we were to reject this two-part framework and assume that the statutory inquiry turns on the meaning of "modify," we are not convinced that the FCC's proposed definition wins. While dictionary definitions from the time of enactment are ambiguous,[15] compare Modify, Black's Law Dictionary (6th ed. 1990) (defining the word to mean "[t]o alter; to change in incidental or subordinate features; enlarge, extend; amend; limit, reduce" and noting that such an alteration or

---

[15]But see Modify, Black's Law Dictionary (12th ed. 2024) (listing as its second definition "[t]o make more moderate or less sweeping; to reduce in degree or extent; to limit, qualify, or moderate").

change could be characterized quantitatively as "either an increase or decrease"), with Modify, Merriam-Webster's Collegiate Dictionary (10th ed. 1994) (defining "modify" to mean "moderate" or "make less extreme"), words need not be read in isolation, see Dubin v. United States, 599 U.S. 110, 120 (2023). Rather, "[l]inguistic and statutory context also matter." Id. (alteration in original) (citation omitted). "[A] statute's meaning does not always 'turn solely' on the broadest imaginable 'definitions of its component words.'" Epic Sys. Corp. v. Lewis, 584 U.S. 497, 523 (2018) (citation omitted).

This statute's context suggests that a narrower definition of "modify" is more appropriate. First, as discussed above, Section 202(h) instructs repeal or modification of regulations that the FCC "determines to be no longer in the public interest." § 202(h), 110 Stat. at 112. Even if we assume this instruction doesn't create a two-step process, at the very least it limits the Commission's authority. Second, under the principle of *noscitur a sociis*, "a word is known by the company it keeps." Yates v. United States, 574 U.S. 528, 543 (2015). This canon, which is particularly appropriate to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words," Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 575 (1995), instructs us to look at the nearby word "repeal," which means to "revoke, abolish, annul, . . . rescind or abrogate," Repeal, Black's Law Dictionary (6th ed. 1990). When read with "repeal," "modify" is better understood under its more limited reading, which allows the FCC to loosen the regulation but not tighten it.

The deregulatory nature of the 1996 Act also supports this view. The Act's purpose, as stated in the preamble, is "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." See 110 Stat. 56; see also Bittner v. United States, 598 U.S. 85, 98 n.6 (2023) (noting that a preamble is "a permissible indicator of meaning" that "is a key to open the mind of the makers, . . . and the objects[] which are to be accomplished by the provisions of the statute" (citations omitted));

Coosaw Mining Co. v. South Carolina ex rel. Tillman, 144 U.S. 550, 563 (1892) (identifying a statute's preamble as useful "when ascertaining the meaning of a statute which is susceptible of different constructions"). "What [Section 202(h)] does not mean, and what this cannot mean, is that the Commission properly may wedge in new, burdensome rules on broadcasters . . . ." 2023 Order, 38 FCC Rcd. at 12875 (dissenting statement of Comm'r Nathan Simington). Tightening Note 11—i.e., *increasing* regulation—is contrary to the Act's stated purpose.

Our case law interpreting "modify" more broadly in other circumstances does not convince us here. See Huey v. Sullivan, 971 F.2d 1362, 1367 (8th Cir. 1992). In Huey, we interpreted "modify" in the Equal Access to Justice Act to mean "to change or make different." Id. But that decision turned in part on the word's placement near "alter," which is similarly defined, and the Act's legislative history, which supported a broader definition. Id. Here, principles of statutory interpretation counsel against such a broad reading. Nor are we persuaded by the fact that Congress could have used a different word, such as relax or loosen. Our statutory analysis here focuses on the language that Congress did use, not the language it could have used. Cf. Bittner, 598 U.S. at 94 (noting that "[w]hen Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning.").

The FCC's fallback is policy. The Note 11 amendment was a necessary change to "close a loophole that broadcasters had been exploiting to circumvent the local ownership limits," the FCC argues. As laudable as the FCC's motive may be, however, its actions cannot exceed the scope of its authority. Though "the FCC has identified a potential loophole . . . that it really wishes its [Section 202(h)] powers covered, . . . wishing doesn't make it so." See Gray Television, Inc. v. FCC, 130 F.4th 1201, 1228-29 (11th Cir. 2025) (Brasher, J., concurring). Moreover, Petitioners point to persuasive record evidence showing that the amendment to Note 11 may be bad policy. Prior to the amendment, "placing major network affiliations on [low-power TV] stations or multicast streams . . . often enabled broadcasters to

bring such network programming to so-called 'short markets,'" markets with fewer than four full-power stations to accommodate all the major networks.  See 2023 Order, 38 FCC Rcd. at 12837.  Following the amendment, consumers in these "short markets"—about a quarter of all television markets—may lose access to significant programming.  See NAB Reply Comments, at 53-54.

We recognize that our decision appears to put us in tension with the Third Circuit's decision in Prometheus I, 373 F.3d at 394-95, in which the court declined to read the "repeal or modify" provision of Section 202(h) as a "one-way ratchet." But the Third Circuit's brief analysis on this point improperly suggested that such a reading "ignores both 'modify' and the requirement that the Commission act 'in the public interest.'"  Id. at 394.  The narrow reading of "modify" we adopt does neither. It still allows the Commission to tweak its regulations so long as it does not *tighten* them, and it still requires the Commission to act "in the public interest" as it does so.

Finally, we note that our decision today only interprets the FCC's authority under Section 202(h).  The Commission suggested it may have authority to enact the same amendment under alternate provisions of authority.  Oral Arg. at 41:49-43:30. Because only the validity of the *amendment* to Note 11 was raised in briefing and because we have determined the amendment was invalidly adopted under Section 202(h), we do not address whether the Commission has authority to adopt the same amendment under alternative grants of authority.  Nor do we consider the validity of Note 11 itself.  Cf. Gray Television, 130 F.4th at 1213-14 (majority opinion) (declining to consider whether the FCC exceeded its statutory authority in issuing Note 11 because the issue had not been exhausted); see also id. at 1224, 1229 (Brasher, J., concurring) (concluding that the issuance of Note 11 likely exceeds the FCC's regulatory authority); 2016 Order, 31 FCC Rcd. at 9882-83 (explaining the basis of its statutory authority for Note 11).  Further, because we grant the petition on Section 202(h) grounds, we need not address Petitioners' arbitrary-and-capricious, Communications Act, and First Amendment arguments. See also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades

Council, 485 U.S. 568, 575 (1988) (noting the "prudential concern that constitutional issues not be needlessly confronted").

This leaves us only to determine the remedy. The amendment to Note 11 was adopted in excess of the FCC's authority under Section 202(h). "[T]he [FCC] ha[s] not shown 'at least a serious possibility' that [it] will be able to reach the same outcome on remand . . . ." See Marin Audubon Soc'y v. FAA, 121 F.4th 902, 918 (D.C. Cir. 2024). Thus, we adopt the "normal remedy" for this unlawful agency action and vacate the amendment[16] to Note 11. See Bridgeport Hosp., 108 F.4th at 890 (citation omitted).

V.

For the foregoing reasons, we grant the Petitioners' petitions in part, vacating and remanding the amendment to Note 11 and the Top-Four Prohibition, including the audience share methodology. We withhold for 90 days issuance of the mandate as to the Top-Four Prohibition. We deny the petition for review on all other issues.

_____

---

[16]We do not vacate Note 11 itself, as the petition only argued that the amendment was invalid.